The next matter, number 25-1908, Novartis Pharmaceuticals Corporation v. Aaron M. Frey. At this time, would counsel for the appellant please come to the podium and introduce yourself on the record to begin? Good morning, Your Honors. Jessica Ellsworth on behalf of Appellant Novartis, and I'd like to reserve two minutes for rebuttal. This appeal concerns Maine's effort to use state law to impose additional obligations on drug manufacturers who participate in the federal 340B discounted drug pricing program. The state law appeared for the first time nearly 35 years into this program's operation. And because it frames our argument, I think it's important to start by clarifying what Maine's law does not do and what it does do. So let's talk first about what it does not do. This law does not regulate pharmacies, including what drugs they dispense or on what terms. This law does not change how many units of a drug are dispensed in Maine or where individuals in Maine can go to fill a prescription. The state law does not create patient access to any drug or affect the price that any patient pays for any drug. The state law does not cover all manufacturers, all pharmacies, all hospitals, or all drug deliveries. And the state law does not regulate the health and safety of Maine consumers, unlike, for example, a regulation governing a dangerous drug or pharmacist licensing requirements. So what does this law do? It does three things that are particularly relevant here. First, it changes the price tag that applies to certain units of drugs from the commercially available price to the federally 340B discounted price. And it allows covered entities and for-profit pharmacies to split that additional profit between that commercial price and the discounted price. Again, this changes nothing about whether a patient can walk into a pharmacy and walk out with a drug. It is a back-end accounting mechanism and really nothing more. Second, this state law prohibits manufacturers from requiring basic claims data, such as who the patient is that this discounted 340B drug is going to and who the provider is that wrote the prescription. This very basic claims data is what manufacturers can and do use to evaluate whether the sale is properly within the scope of the 340B program and that they use in following up on their rights under the federal statute to audit covered entities about their sales. The third thing the state law does is to create new state law enforcement mechanisms and remedies for this federal program. I'd like to talk today about preemption because that's the bulk of why we're here. The touchstone in any preemption case is congressional intent. And so when this court looks at this state law and tries to figure out whether nearly 35 years into this federal program's existence, there was an opening for states to add their own additional requirements and prohibitions that conflict with and are an obstacle to the federal program. I think taking your first point, the price tag piece, I think the point that your opponents make is that the congressional statute is silent as to kind of how many pharmacies can be associated with a covered entity. So what's your basic response to that point? I have two responses to that point, Judge Dunlap. And I'd like to start with the fact that this is a spending clause piece of legislation, the 340B program. And in the Cummings case that we cited in our brief, it's a recent Supreme Court case on the spending clause. One of the things that the Supreme Court specifically talked about is that in the spending clause context, because the notion of offer and acceptance is critical to how spending clause legislation works, courts cannot, quote, treat statutory silence as a license to freely supply additional terms. And that is exactly what Maine is trying to do. It's trying to use statutory silence in order to create new terms. And I would push back on, first of all, the fact that there is statutory silence, because the federal statute does include a prime vendor program. We talk about it in our briefs. That prime vendor program is a delivery mechanism. So it's not entirely silent on this. And then the other thing I think is important to recognize is that the federal government has followed through on the fact that there is no requirement for manufacturers to recognize unlimited numbers of pharmacies. We filed a motion for judicial notice with this court in which we attached two decisions from HRSA, the agency that adjudicates the dispute resolution mechanism. And there, there were covered entities who were challenging Novartis' policy of having only a limitation of one contract pharmacy. And what the federal government said in adjudicating that is that is not an overcharge and that is not an interference. It doesn't violate 340B, but it seems to me what the nub of this case is about is does this statute do anything other than set the price and provide for an opportunity for certain covered entities to purchase at that price? And if that's all the statute does, then all of these things are outside of that statute. And when I looked at the history of this statute, what I came to learn was it really was price focused. Because in 1990, there was a Medicaid rebate law that caused trouble because of the best price aspect of it. And the response was we're going to lock in rock bottom prices for certain covered entities. And we're going to have some rules that they can't cheat. But that's like sort of what it was. And so then the question is, well, what is this? Well, it's something different, not contemplated. And that's what the Third Circuit and D.C. Circuit, at least to me, seem to say. So, Your Honor, I think what the Third Circuit and the D.C. Circuit say when you read those decisions is that Congress expressly preserved the ability for manufacturers to impose commercially reasonable terms and that those commercially reasonable terms that manufacturers are allowed to impose. I don't know about those decisions. I guess I've read those, obviously. I mean, that's not how I get them. I get there's congressional silence. And, of course, in the absence of Congress saying anything, as a player in the soup, so to speak, the drug companies can do what they want, subject to all the political forces in the world, which might be states if they choose to get involved. So, Your Honor, I think that there are two cases from this court that I think are most important to look at. One relates to field preemption, and one relates to conflict preemption. On field preemption, it's the French case from this court in which this court looked at a federal law that provided a list of pilot qualifications and had a uniform mechanism for enforcing those pilot qualifications. And this court said that occupied the field and did not allow Rhode Island to impose an additional layer of its own qualifications. That, I think, is directly on point with the situation we have here. And on conflict preemption, I think the key case from this court is the Maine Forest Products Council case in which this court said the question is whether the federally enacted program confers a right, either explicitly or implicitly. What's the right? What is the right that's – I know how that – you know, the law there, but what's the right here? So I think it is the right to make an offer. You're obligated to make an offer under the federal statute to sell drugs to covered entities at a 340B discount. You are not obligated. You have the implicit right to set commercially reasonable terms on what that offer is. It is an offer. The covered entity can accept your offer. It cannot accept your offer. But you, the manufacturer, get to set the terms of that offer. And that is because – why do we think Congress wanted that? So we think Congress wanted that because, again, I'm going to circle back to the fact that this is spending clause legislation. And what – the way spending clause legislation works is that regulated parties are put on fair notice up front of the sum total of their obligations. And so if Congress wanted to impose obligations that said, and by the way, when we said you sell to covered entities, we also mean that if those covered entities want to spread tentacles all over the United States and claim sales through all sorts of pharmacies all over the country, you have to do that too. Because Congress did not do that in spending clause legislation like this. Congress's view was, look, yes, cost of a program is the price times the unit. And what the history seemed to show is we care very much about the price. Now, when I read the House report, it said we are putting no limits on the volume through this program. So they just don't really have an interest, for whatever reason, in the cost. They're focused on the price. So, Your Honor, if I may push back on that just for a minute, because I think there are two clear indicators that they are interested in the size. And I think that's important to recognize. The two things that Congress did say are prohibited, there's a diversion restriction. The diversion restriction says a covered entity can't go resell these drugs. It can't transfer them to other people. If there were truly no limit from Congress, then there would be no reason for a diversion. The other thing that the statute prohibits is duplicate discounting. Because, Your Honor, this program is like the price of admission to Medicaid. And what Congress was giving up for every 340B discounted sale is the Medicaid rebate, the money that the federal government and the state governments would otherwise get from that rebate. So there is absolutely a balancing going on of how to— Adding a much more draconian part of the balance, which is, and if we don't like how you distribute the drugs, that's included too, which if they cared about that, you'd think they'd say that. And instead, they don't say anything about that. And in fact, the history I could find says they don't really care about the volume. And so this silence, we're supposed to say, well, that means Congress really wanted to preserve the ability. It's not just silence. It's actually affirmative. You can do what you want as you deal with the covered entities. As long as you make them a bona fide offer, that's it. So, Your Honor, I think when you look at the silence, you have to look at whether there is a conflict between the method that Maine has selected to achieve this growth in 340B sales and what Congress itself selected. And we've been talking a lot about the price tag. There is also this claims data prohibition, which I think is equally important because that is what manufacturers use to monitor whether covered entity sales are ones that are suspicious in a way that would trigger doing an audit of those covered entities. And there is no appeals court that has found that this kind of claims data prohibition is in any way not preempted. And I think this court should look at that. And then the other aspect I think is really important is that the Supreme Court held in ASTRA, which was not a preemption case, but in ASTRA, the Supreme Court was very focused on the fact that there could not be federal common law available as a remedy for covered entities because— I agree ASTRA was about a dispute that was about price, which is at the core of 340. I don't think anyone can dispute that statute is concerned with price. And that's what the ASTRA situation was about. And what I took the court to say is that is 340B, that is HSRA, ADR. You can't agree with that. Your Honor, I do agree that that was concerned with price. But the Maine statute is absolutely concerned with price too. The only thing that Maine is interested in when it comes to these contract pharmacies is that there is a different price tag that attaches to those units of drug that are being delivered wherever. But it is the price tag that differentiates— I agree that they're interested in volume because you can buy— obviously if you can get it to more patients, you can buy more of it at the ceiling statutory established low price. So this does let the covered entities buy more of it. And if you times price times the unit, that's going to be good for them and bad for, I guess, the companies. Your Honor is right that it increases the size of the subsidy. That is why when first it was the federal government in 2010 who said, we're going to put out a guidance document that says we think there can be unlimited numbers of contract pharmacies, you saw the number of increased contract pharmacies explode 20-fold. And this drug pricing program suddenly became the second largest drug pricing program anywhere in the country. How do we know if that's good or bad or indifferent? I mean, I guess Congress, if Congress just didn't deal with the volume piece, then is that good or bad? I mean, isn't that Congress's problem if they didn't write it well enough leaving it? As the Third Circuit in D.C. Circuit said, in the absence of anything, yes, of course, the manufacturers can do what they want. But what you're saying is, and we can do what we want and all the other political actors are not players. It's really only up to us. When it comes to a state program that specifically targets this federal program, and that is what makes these laws very different. This is not some sort of generally applicable state law. If you think about the au pair case that this court had a few years ago, you had a federal regulation governing sponsors who participate, and you had a state regulation generally setting out wage laws that applied across the board, including to participants in the au pair program and their families. And this court found there was no preemption because these two statutes regulated different entities. One was generally applicable. It wasn't just glomming on to a federal program, regulating only those participants in the federal program and layering on state-specific restrictions that states were adding. When states are not a party to the agreement that manufacturers, Novartis has entered a PPA. It's a 10-page single-space document. It largely replicates the statutory obligations. But Novartis and the federal government enter this agreement together. It lays out the terms on which 340B program operates. And then Maine, who's not a party to the contract, not a party to the PPA, says, we'd like to add additional terms just on that agreement. I mean, there is really the closest case I have found to this, I think, is the case from Maine involving Maine restrictions on the H-2A visa program when it didn't want Canadian drivers to be able to transport logs across Maine. And it was a state law that specifically targeted the federal program in the same way that this law specifically targets the 340B program. And this court found that it was preempted. But the predicate to that is what they did is actually within the 340B program. I mean, that's the framing or the predicate that your argument is based on. Yes, Your Honor. And in the 340B program, you have the pricing term. You have the requirement to make an offer without any restrictions on the limitations that can be included in that offer. You have a uniform nationwide enforcement system that Astra talked about. And that enforcement is done by the same agency that also oversees Medicaid. So when they have to make determinations on things like should this be subject to a Medicaid rebate or should this be subject to 340B pricing, as the Supreme Court recognized, Congress set it up so the same agency would be making those determinations. And then the Maine statute goes one step further by adding on its own remedies, including an injunctive remedy, and also increasing the penalties for violations in ways that the federal statute doesn't contemplate. So I think when you read the Maine Products Counsel case again, I'm sure you're all very familiar with it, but when you read it again and you think about how it compares to this case, it really does map on quite straightforwardly. Thank you, Your Honors. Thank you, Counsel. At this time, would Counsel for Maine please introduce herself on the record to begin? Good morning, and may it please the Court. Kimberly Betwarden on behalf of the Maine Council. Can you just pull the mic closer to you? Will it go forward to you? Yeah, great. Thank you. Kimberly Betwarden on behalf of the State Defendant. Last year, the Maine Legislature enacted Chapter 103, known as the Protect Healthcare for Rural and Underserved Communities Act, and that's what the legislature was concerned about, the risk to critical healthcare services provided to Mainers by covered entities. That's not an abstract risk. Just last year, Inland Hospital, a covered entity that was located in Waterville, Maine, closed permanently. Maine covered entities use the savings from the 340B program to benefit their patients and their communities. They've used those savings to fund medication assistance programs, to provide free healthcare to uninsured and underinsured patients, and to provide free substance use disorder treatment. Other examples of critical health services that manufacture – That's fine, but all of that is, and that's all good, but it's all based on the idea that by increasing the size of this federal program, we can fund these worthy endeavors within the state of Maine. And what your friend says is, right, that's the problem. And so that that's not the typical sort of health and safety things we think about. That's just basically trying to get money out of the federal system through their agreements with Novartis, et cetera, to fund things Maine would like to see funded. And that doesn't seem like typical health and safety sort of legislation. So I disagree. The state disagrees that this is not typical health and safety regulation. We contend Chapter 103 is a health and safety law, and that the presumption against preemption would be applicable here. I just mentioned the name of the statute, but I think Chapter 103 is one example of a Maine state law or program ensuring access to health care or medications. For example, Maine expanded Medicaid coverage in 2019 in accordance with the ACA. But is that only as far as dollars and cents? Like, there's nothing about this law that a person who wants to get a drug that was prescribed to them is – you know, I'm holding my script. I'm better or worse off because of this distribution requirement in the law? I don't think that's necessarily the case, Your Honor. It's certainly possible for – keep in mind Chapter 103 applies to both in-house pharmacies and also contract pharmacies. And for an in-house pharmacy, there is certainly an ability for the covered entity to pass those savings along to the patient. So I don't necessarily agree that's the case. Also, in terms of the state acting in a way to ensure that there are medications available at discounted prices for its residents, I'll also point you to – that a covered entity may or may not make. So perhaps the covered entities put it to all these good uses. But I think what we need to do is look at the law itself, right, and see what the law itself does. And can you articulate for me what the law does other than change the price point for certain of these drugs covered by the 340B program? So Section 7753 prevents manufacturers from limiting the use of contract pharmacies and from conditioning delivery on providing patient claims data. Those are the two ways that it functions, and those are the two things that are challenged by Novartis and other manufacturers. So what I hear you saying then is that its effects really are limited to the federal program itself. This is certainly a law that addresses participants in a federal program. We're not disputing that. It's very clear on the face of the law and the definitions that are utilized. I think when Novartis says that, well, that means we're being targeted, I'm not sure that's a helpful phrase. From the state's perspective, the appropriate analysis is still any sort of regular preemption analysis, just as this court did in Cormier. There, there was a definition in the public law 280 that specifically called out the H2B program. It was a law that addressed or targeted certain visa holders, but this court applied a traditional preemption analysis to determine whether or not there was a conflict with federal law. That's the same analysis that should apply in control here. Chapter 103 is very similar to the laws that were upheld by the Fifth Circuit. We can break this up into field preemption, impossibility preemption, and obstacle preemption. So let's talk about field preemption. What do you say the field is here that we're thinking about? So we've stated the applicable field as either the practice of pharmacy or the distribution of drugs to needy patients. That's what, that's, and that's also what the district court determined what the field was. And so... It doesn't need to be just an invocation of words as opposed to a determination of what the law actually does, which kind of goes to the question that I was asking you. It seems to me that there isn't really any distribution regulation or pharmaceutical regulation other than determining the price at which these drugs are provided to the pharmacies. No, that's not the case because Section 7753.1 says that manufacturers cannot limit the delivery of drugs to covered entities. But there's no question that the drugs have been delivered to the pharmacies, right? Because this is operating in the context of a replenishment model, right? Correct me if I'm wrong, but it strikes me that the delivery has already occurred. And so there's no dispute that Novartis is, in fact, delivering the drugs to the pharmacy. Again, correct me if I'm wrong. It seems to me that the only question remaining then is how much are the pharmacies going to be paid for the drugs that have been already delivered? So certainly the replenishment model adds a different wrinkle to this. But I think at its core, and number one, I don't think that any of Novartis's arguments depend on the replenishment model. I think they would have the same arguments and make the same claims if the replenishment model did not exist. And that they're concerned with being able to impose a limited number of conditions against covered entities with respect to the offer, but doesn't depend on the replenishment model. But with respect to the replenishment model, I think the answer to Your Honor's question is that when the covered entity is using that model, they are seeking to allocate the prescription that was filled to a patient that presented at that pharmacy. But that would be no different if they presented at the in-house pharmacy as well. I guess I'm confused by your field preemption answer in that you focused on the main law. I mean, it seems to me you'd focus on what is the federal sort of field that they don't – you have to agree there's some part of 340B you can't insert yourself into. You cannot say the price is going to be something else. That's correct. So what are the limits then? There's some field there that you can't get into. So what is that? Is that – It's certainly the price. The statute can't change the price of these transactions. And also the state could not be able to intrude on any sort of the enforcement mechanisms that are in the 340B program for overcharges. Those are governed by the ADR and the audit process. And the state also would not be able to prevent a manufacturer from obtaining an audit. But I think that's really the limits of the program. But I think those map on precisely to what your opponent argues this law does. So it seems to me that you've just made the argument for them. If the state can't do those things, what else does this state law do? Sorry. I was answering the question of what does the federal law do.   And so that's – Yes. So if that's the field, if we agree that's what the field is. Yes. So – It seems like this law is operating precisely in – No. And I think the distinction here is that we're talking about really, I think, two different levels of transactions. And so if, for example, a covered entity does not agree to Novartis's conditions on the claims data or contract pharmacies, that transaction does not take place. So there's nothing about – the replenishment model doesn't come into effect or not. There just simply is no transaction. I think Novartis is combining that with the subsequent transaction that occurs between different entities, which is the patient and provided for the health insurer to the pharmacy to the wholesaler to the manufacturer. That's a different transaction that occurs. But the Maine law doesn't affect the price of either of those transactions. Maine doesn't dictate the price that the covered entity purchases a 340B drug for under the 340B program. And Maine law in Chapter 103 also does not dictate the price that is paid for that other transaction. What it does do is it limits – if they can enforce the conditions, it will limit, I would think, the volume of 340 drugs that covered entities will be able to buy because they won't be able to distribute them to patients, which is what allows you to get the drugs, right? So it is about volume. And is that the same or different than price? Volume is not the same as price. I don't think there's anything in the federal statute that indicates there's a limit on the volume of transactions that were to be included in the 340B program. And frankly, if all of the same transactions were funneled through a contract – apologies – were funneled through the in-house pharmacy, that would not be a violation of the 340B program at all. So the 340B statute does not speak to volume. There's no indication that Congress had intended to limit the volume of transactions that are pursuant to this program or included in this program. If you're talking in terms of the Congress's Commerce Clause powers, you know, I track with you there because congressional silence, we typically don't read in an intent to preempt state law. But this does seem to me to be a little bit different being in the spending clause context where they've – Congress set up this scheme and Congress can change it, the manufacturers can change it. But if the states weigh in, it seems to me that it alters the balance that was otherwise struck between Congress and the manufacturers with potential ramifications for Medicaid and how that system works. And so it would strike me as unusual in that context for Congress to have allowed states to operate simply by silence. If Congress did not want states to participate in this program, they certainly could have said so. But there's nothing in 340B that says one way or the other. Would you say you're participating in the program or would you say that you are dealing with sort of an unspoken – I mean there's a question of like can they create any offers that they want in the statute's silence. So if one concludes they meant something by that, then it feels like you're stuck with it. And if they didn't mean anything by that, then it seems like it's a problem for all the actors in the system to work out. Participating is I think a – not what I intended to convey there. I think if Congress had intended states not to be able to utilize their sovereign authority with respect to this program, they would have said so. They're not participating in the 340B program. But generally, congressional silence on an issue means that there is room for the states to regulate with respect to field preemption. Thank you. Thank you. Thank you, counsel. At this time, would counsel for the appellant please reintroduce herself on the record? She has a two-minute rebuttal. Good morning, Your Honors. Jessica Ellsworth again for Novartis. I'd like to make a few short points in rebuttal. The first is that, Judge Aframe, you were exactly correct when you said there was no impact on a patient's ability to get a medicine from a script in their hand based on this main statute. That is right. There is no restriction on the ability of a pharmacy to have this drug on its shelf to hand to a patient when they come. But that all runs to this presumption piece, right? Is that – that's why you're telling – I mean, you started with that. Yes. You're trying legally to convince. So, okay, even if I say there's no presumption, I guess I didn't really follow this and all the stuff I read about this case, where does that take us? That doesn't mean you win. That means there's no presumption. And what does that – take that – move forward with that if I think you're right about that? So I think that takes you to having to look at whether the federal – for field preemption, you start looking at whether the federal interest is dominant and whether there is any role that was left for the states. And you have a program here that ran for over three decades with zero state involvement, which Congress did not give any state a role in the program. It was caused by something that happened, right? There was – contract pharmacies had been there. There had been a back and forth, 2010. Then there's more aggressive. The program explodes. Your companies react. And then states say, hey, we would like – Your companies react. The courts – sorry. The agency does something else. The courts say you can't do that because the statute is silent. Then, okay. Then the hospitals feel like, okay, we lost at the federal level on this thing. We're going to try to win over here. And that's usually good. That's how our federal system works unless Congress really didn't want that. So that's the numb of it. Did Congress really not want that? And I guess I still haven't heard why. So I think – let me try one way to take a run at that because I think the states' argument, if it were right, would prove too much. It would mean there are certainly spending clause programs like Medicaid where Congress has said there is a role for states. Here is their assigned role. Here is their lane they swim in. Everything that a state does has to be signed off on by HHS through the state Medicaid plan. But, like, here is the role that states get. What Maine's argument would mean is that where Congress has not assigned states a role and where Congress has said we are entering into an agreement just with a private party, that nonetheless a state has more power than it would have in a context in which Congress had given it a role. And the state could say, well, because you didn't give us a role or not give us a role, we can impose anything we want. We have no limits on it. Congress could take that back at any time and say our program – actually, we forgot to deal with volume for whatever reason. And so we're going to deal with volume. They could do that. Judge Aframe, just to – I'm sorry, but you're also operating with the historical backdrop that this area is a traditional area of state regulation. So you have to bear that in mind also. Judge Thompson, I'm glad you asked that because I think that's a real misnomer. There is no traditional state regulation of manufacturers' obligations to participate in the federal 340B program. None. I heard my friend on the other side say that the field should be considered the practice of pharmacy or the distribution of drugs to patients. And there might be state regulation of pharmacies and state regulation of distribution to patients. This statute does not do those things. Pharmacies are not regulated entities. There is no limitation on how a covered entity spends that additional money that it gets. The only regulated entity is the pharmaceutical manufacturer. This is a regulation of pharmaceutical manufacturers' obligations to participate in a federal drug discount program and nothing more. And so the field, when you look at it through that, the field is not one in which the states have played any role. States have never set the terms of participation in this federal program or any other federal program outside of a context where Congress specifically asked states to do so. For all these reasons, you're on. Just one more question. I mean, the framing, it seems to me it does all come down to how you frame it. I mean, you say it's a spending clause program. And if the spending clause conditions are, one, the price is set, two, you can make whatever offers you want and nobody can touch it, that's what you've agreed to. If the program is there be price ceilings and there are some rules about diversion and double discounting and that's the program and you agree to that, then you're just kind of, you're leaving yourself open to what happens in the political marketplace, so to speak. Your Honor, I don't think this is a case where the manufacturers and certainly where Novartis has said it has unlimited authority to impose any restrictions that it wants. What Novartis has done is adopt the very specific terms of a contract pharmacy policy and a claims data policy that both the D.C. Circuit and the Third Circuit recognized were commercially reasonable for manufacturers to do in this program. And what the D.C. Circuit said on this I think is important because if a manufacturer puts terms and conditions on an offer in a way that makes it not a bona fide offer, then it would violate federal law. So whatever layers of policies a manufacturer might have, it has to be a bona fide offer to sell in order to comply with federal law. That is something that HRSA monitors, the agency that is tasked with doing so, and that is something that I think the D.C. Circuit was very attuned to in saying that this commercially reasonable discretion that Congress allowed manufacturers to have is not unlimited. Thank you, Your Honors. Thank you, Counsel. That concludes argument in this case.